UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

WAUSAU UNDERWRITERS
INSURANCE COMPANY,

           Plaintiff,           CASE NO. 15-12954

vs.                                  HON. GEORGE CARAM STEEH

RELIABLE TRANSPORTATION
SPECIALISTS, INC., AMARILD
USHE and BURT HOLT,

           Defendants.
_____/

ORDER DENYING PLAINTIFF'S MOTION
FOR SUMMARY JUDGMENT [DOC. 145]

This case stems from an underlying lawsuit (the "Holt Litigation") filed by Burt Holt against Reliable Transportation Specialists ("Reliable"), Amarild Ushe, and Containerport Group Inc., related to injuries sustained by Holt when he was struck by a tractor trailer operated by Ushe. The Holt Litigation proceeded to trial and Holt obtained a verdict against defendants Reliable and Ushe in the amount of $8,735,142.35.[1] Defendants took the position that Wausau Underwriters Insurance Company ("Wausau") is

---

[1] The total verdict was $22,616,669. After necessary reductions were made, the total award against Reliable and Ushe was $8,735,142.35 and the total award against Containerport Group Inc. was $6,919,164.13.

responsible to pay the entire amount of the judgment against them, including that part of the judgment exceeding Wausau's $1,000,000 limit of insurance under the Policy issued to Reliable.

The present litigation arises out of plaintiff Wausau's declaratory judgment complaint seeking a declaration from this court that it is responsible for no more than the policy limit under the commercial insurance policy issued to Reliable and that defendants are precluded from asserting any claim for bad faith with respect to the Holt Litigation. Wausau initiated its declaratory judgment action against Reliable, Ushe and Holt while the underlying verdict was being appealed by Reliable and Ushe.

Reliable and Ushe filed counterclaims for breach of contract and tort, alleging that Wausau acted in bad faith against its insured by refusing to negotiate a settlement within the policy limits in the Holt Litigation. The tort count has been dismissed, leaving the breach of contract / duty of good faith and fair dealing claim asserted against Wausau. The matter is presently before the court on Wausau's motion for summary judgment. Wausau argues there is no issue of material fact that it did not act in bad faith in its settlement negotiations with Holt's counsel. A second issue

argued by Wausau is the proper measure of damages recoverable in the event an insurer is found liable for bad faith failure to settle.

The court is familiar with the case and has read the pleadings filed by both sides. The court does not believe that it would benefit from oral argument in this matter and is therefore deciding the motions on the briefs. L.R. 7.1(f)(2).

I. Statement of Facts

There is a long record of Wausau's evaluation of the potential value of the Holt Litigation, as well as its potential exposure. At the pre-trial stage, defense counsel believed that at least 50% of any liability rested with Holt for entering the insured's driving lane and for being distracted by talking on his cell phone. The driver, Ushe, drove straight forward and stayed in his lane. There was a witness who confirmed he was talking to Holt on the phone at the time of the accident. Holt was not expected to be a credible witness. As for the weaknesses of the defense case, the defense recognized that Ushe knew Holt was walking around in the area of his truck and was likely distracted on his cell phone. In addition, the defense was concerned about Ushe not relating to a jury because he did not speak English and required the use of a translator. The defense identified the strongest aspect of plaintiff's case to be damages, which

included physical and mental issues that significantly impacted Holt's life after the accident.

Wausau first retained Michigan staff attorney Gregory Light to defend Reliable. In March of 2013, Light opined that liability favored Reliable. Case evaluation on May 13, 2013 valued the case at $750,000, which Light believed to be excessive, and which both sides rejected.

On July 26, 2013, attorney Terry Lynch, manager of the Michigan staff legal office, opined in a telephone conference with Wausau employees Brian Diericks and Michael Ray that the full verdict value was up to $2,000,000 and that there was only $1,000,000 in coverage. Lynch explained that when there are significant damages, juries have a hard time separating liability from damages. Lynch recommended that Wausau settle for up to the $750,000 case evaluation. On August 7, 2013 Reliable was advised that Holt's settlement demands of $3,000,000 exceeded policy limits. Reliable retained its own counsel, attorney Tom Schulte, who on November 14, 2013 demanded, for the first of what would be many times, that Wausau settle the case within policy limits.

Wausau reassigned the case to Mike Batalucco, who in April 2014 re-evaluated the case after becoming aware that Holt had back surgery resulting from the accident. He valued the case at a likely verdict of

$1,500,000 to $3,000,000. Mr. Schulte testified that he was never given Lynch's or Batalucco's assessments of the case (Schulte dep., p. 20)

Wausau then reassigned the case to outside counsel Richard Joslin, who handled the case from April 2014 through trial in June 2015. When Joslin first came to the case his opinion was that there was a strong defense, that there will be a finding of comparative negligence, that Reliable had a 70-75% chance of obtaining a verdict in its favor, and that in his view, the maximum expected verdict was $2,000,000. Joslin estimated the settlement value of the case was in the $300,000 to $500,000 range. In Joslin's Pre-Trial Report, dated December 2, 2014, his evaluation of the case remained relatively consistent.

Claims personnel at Wausau held a roundtable to discuss strategy as well as reserve and settlement authority on October 13, 2014. The discussion centered on the second case evaluation award of $1,000,000 (on September 22, 2014). There was agreement that the award should be rejected.

A settlement conference was held with trial court Judge Kathleen MacDonald on November 3, 2014. Wausau extended an offer of $50,000 to settle on behalf of Reliable, to which Holt did not respond. A second offer of $175,000 was rejected without a counter-offer. A second

settlement conference was held January 30, 2015 with Judge MacDonald. Holt initially demanded $2,000,000, but then dropped his demand to $750,000. Wausau countered with an offer of $250,000 which was not accepted. Joslin reported to Wausau that Holt's counsel stated after the conference that his demand against Reliable was $2,000,000, and the Judge was wrong when she stated it was $750,000.

Trial was set for May 15, 2015, and in the interim Wausau attempted to negotiate a high-low arrangement on behalf of Reliable. Mr. Diericks obtained authority to offer $1,000,000 as the high, and on April 23, 2015 he offered a high-low of $150,000/$1,000,000. Holt's counsel rejected. On May 15, 2015, Judge MacDonald held a settlement conference where Holt's final demand was $790,000 and Reliable's highest offer was $470,000.

The case proceeded to trial on May 18, 2015. Wausau sent a field investigator to trial to observe the proceedings and to send daily updates. However, responsibility for providing recommendations regarding value or settlement were reserved for attorney Joslin.

Jacob Sievers, the dispatcher who spoke to Mr. Holt many times each day, testified on May 19, 2015. He explained that prior to the accident Holt was always happy – in fact his nickname in the office was

"Happy" – and he never complained or missed a day of work. After the accident he was depressed and unrecognizable. Sievers also testified that Ushe should not have moved his truck if he knew that someone was next to it. Wausau's investigator reported that Sievers was honest and his emotional impact on the jury could be high.

Mr. Ushe testified on May 19 and 20, 2015. By all accounts, Ushe's testimony did not go well for the defense. Ushe testified it was his job to see anyone who was in his mirror's view, and on that day he failed to see Holt standing between the trucks. This was a concern raised at the outset of the case by Mr. Lynch, as well as in the pre-trial reports of Joslin (Exhibit U, December 2, 2014) and Diericks (Exhibit T, December 9, 2014).

Wausau adjusted its evaluation of the likely allocation of liability, increasing the apportioned fault that would be assessed against Reliable. Diericks reevaluated the case and determined it had a value of $875,000. Despite that figure, on May 21, 2015, Diericks only asked for and obtained settlement authority up to $790,000, which was plaintiff's demand before trial started. Wausau decided to wait until after Holt testified to make an offer. Trial was adjourned due to the death of one of the lawyer's family members and did not resume until June 1, 2015.

Judge MacDonald recalled Ushe's testimony "vividly" and believed that Ushe was the worst witness she had ever seen on the witness stand. She "couldn't believe they were going to go forward" with their defense because the testimony "was an admission of liability by their own driver." (MacDonald dep., pp. 14-15, 22)

After hearing Ushe's testimony, Judge MacDonald tried again to settle the case. Holt's attorney, Ven Johnson, confirms MacDonald's account that she persuaded Johnson to agree to accept Reliable's full policy limit if it was offered. (MacDonald dep., p. 16; Johnson dep., p. 58). MacDonald then spoke to Joslin and told him to get authority to settle the case for policy limits. On May 22, 2015 Joslin sent a report to Diericks and Ray, informing them that Judge MacDonald told him Holt would settle for policy limits, but that Holt's counsel stated he would settle the case for $1,200,000 and would agree to a high-low of $900,000/$1,500,000. An email from Schultz to Wausau on May 22 demanded that Wausau settle within policy limits which he identified as the figure Judge MacDonald represented plaintiff would accept.

On May 25, 2015 Joslin, who was the only observer at trial with regard to value, updated his estimated judgment value to $2,700,000 to $3,000,000. Joslin recounted Holt's surgeries and Sievers' testimony

regarding the impact the accident had on Holt's personality.  At this time, Wausau and Holt went back and forth with high-low agreements, ending with Holt demanding $800,000/$1,200,000 and Wausau countering with $500,000/$1,100,000.  Reliable agreed to contribute the additional $100,000 to the high on Wausau's last offer.  Holt rejected the offer.

If Joslin's last valuation had been used to determine the settlement value of the case, Diericks testified that using its computer evaluation program, Wausau would have arrived at a number between $1,300,000 and $1,500,000 in exposure.  This was not done, however, and nobody at Wausau asked for more settlement authority.

On June 5, 2015, Diericks emailed Ven Johnson and offered $630,000 to settle the case.  This offer was rejected.  On June 8, after the close of evidence, Diericks offered $790,000.  Holt rejected.  Closing arguments took place on June 9 with plaintiff requested more than $40,000,000 in damages from the jury.  Before the jury began to deliberate Wausau offered the full policy limit of $1,000,000.  Plaintiff did not respond before the jury reached a verdict.

II. <u>Bad Faith Failure to Settle</u>

A. <u>Legal Standard</u>

The Michigan Supreme Court defined "bad faith" for purposes of jury instructions as "arbitrary, reckless, indifferent, or intentional disregard of the interests of the person owed a duty." *Commercial Union Ins. Co. v. Liberty Mut. Ins. Co.*, 426 Mich. 127, 136 (1986). "If the insurer is motivated by a selfish purpose or by a desire to protect its own interests at the expense of its insured's interests, bad faith exists, even though the insurer's actions were not actually dishonest or fraudulent. *Id*. at 137. The court listed factors which the factfinder can take into account in deciding whether or not a defendant acted in bad faith. *Id*. The factors relevant to the present case include:

1. Failure to keep the insured fully informed of all developments in the claim or suit that could reasonably affect the interests of the insured,
2. Failure to accept a reasonable compromise offer of settlement when the facts of the case or claim indicate obvious liability and serious injury,
3. Rejection of a reasonable offer of settlement within the policy limits,
4. Undue delay in accepting a reasonable offer to settle a potentially dangerous case within the policy limits where the verdict potential is high, and
5. Disregarding the advice or recommendation of an adjuster or attorney.

*Id*. at 138-39.

The court emphasized that the insurer's conduct is to be considered under the circumstances existing at the time it was undertaken. The eventual outcome is not to be considered, as "[i]t must be remembered that if bad faith exists in a given situation, it arose upon the occurrence of the acts in question; bad faith does not arise at some later date as a result of an unsuccessful day in court." *Id.* at 139.

In a concurring opinion, Justice Levin focused on the importance of context where a jury is asked to determine terms such as "arbitrary", "reckless", "indifferent", or "intentional" conduct as the basis of a finding of bad faith. He pointed out that conduct may qualify as "intentional disregard", though it does not rise to the level of bad faith:

> An insurer may properly put its interests ahead of the interests of the insured, and thus intentionally disregard the interests of the insured; it may act out of a 'selfish purpose or by a desire to protect its own interests at the expense of its insured's interest,' as long as it does not act in bad faith. If an insurer could not in any circumstance place its interests ahead of those of its insured, if it is obliged in all circumstances to subordinate its interests to the interests of its insured, then an insurer would be obligated in all cases to pay policy limits lest it expose the insured to any risk whatsoever of a judgment in excess of policy limits.

*Id.* at 141 (footnote omitted).

B. Analysis

Without limiting the evidence that the parties can offer at trial, the court focuses on the facts as they existed at the time of trial in the underlying case. By the third day of trial, when Sievers and Ushe had testified, there is evidence from which a factfinder could conclude that Wausau should have been aware that the case warranted a policy limits settlement. Joslin was Wausau's attorney and only observer in the courtroom for purposes of case value. At this point in the trial, Joslin told Wausau that Holt's physical injuries were worse than expected, that his emotional damages were worse than expected, and that his witnesses had been very effective. Furthermore, Ushe had admitted liability on the stand, defendants offered no competing medical evidence, and Judge MacDonald strongly recommended settlement at policy limits.

At this point Joslin believed the case had a value of up to $3,000,000. If this figure was used in Wausau's settlement evaluation program, Diericks explained that the value of the case would have been $1,300,000 to $1,500,000. However, despite having a week off of trial, Joslin's valuation does not appear to have been considered. Nor did Diericks ask for settlement authority up to the policy limits. Instead, Diericks asked for and

received approval to settle for $790,000 on May 21, 2015. Diericks then waited until June 5, 2015 and only offered $630,000 to settle the case.

Defendants' expert David Cooper opined that Wausau's overall conduct "demonstrated an **arbitrary** and **indifferent** disregard for the interests of the insured." Cooper summarizes the reasons for his opinion:

> [Wausau's] conduct of the settlement negotiations evidenced a *state of mind* that promoted its own financial interest at the expense of its insured's interests. It repeatedly rejected, or failed to meet, reasonable offers to settle, offers that were within the policy limit. It secreted adverse liability memos in its file, pretending they did not exist. It engaged in undue delay in making an offer of the policy limit, delaying said offer until the day of the jury verdict when it was no longer acceptable. It never communicated to the insured, in the form of Mr. Schulte, the evaluation and opinions of its, Reliable's, earlier defense counsel Lynch and Batalucco, both Liberty personnel/ employees. Had he possessed them, Mr. Schulte could have forcefully used them with Liberty's superiors to Mr. Diericks. When a High/Low of $800,000/$1.1 million dollars would have settled as to Reliable it failed to agree to the $800,000 Low figure, which was well within the policy limit. An additional "indicator" of bad faith per the *Commercial Union . . .* decision is that it failed to heed the advice of its defense counsel, early on, that the case warranted settlement authority of $750,000. The same may be said during the trial when Joslin raised his estimate of a verdict up to $3.0 million, and after Ushe's swan dive on the stand, Diericks had revised his percentage of liability likely against the insured up to 50%. No one acted on this lining up of the constellations, when the judge was urgently advising them to pay the policy at a time when there was a one week break in the trial.

Cooper concludes, "it is rare in a Bad Faith case to have five (5) of the Commercial Union twelve indicators that so clearly fit the facts. This is such a case." (Cooper Opinion Letter, p. 30)

Defendants' insurance expert Jeffrey M. Posner also expresses the opinion that Wausau was reckless toward its insured:

> For the reasons stated above, it is my expert opinion that Wausau's conduct was conduct that is consistent with conduct that has breached the duty of good faith and fair dealing under the customs, practices and/or standards of the industry. Wausau (1) pretty much disregarded every piece of advice that suggested the case should be settled and that there was the real potential for an excess verdict; (2) disregarded Reliable's demands that the case be settled; and (3) did not seize any of the settlement opportunities that were presented even after their own trial counsel did not believe the case was winnable and Reliable's assets were at risk.

(Posner Expert Report, p. 16)

Wausau submits the reports of its damages experts, Timothy Yessman and John Monnich, which conclude that Wausau acted in good faith and fair dealing with respect to its insured. (Yessman Expert Report, pp. 25-26; Monnich Expert Report, p. 9)

There are many issues of fact as it relates to whether Wausau acted in bad faith in failing to settle the Holt Litigation within the limits of the Reliable's policy. Wausau's motion for summary judgment on the issue of its bad faith is denied.

III. Measure of Damages

The Michigan Supreme Court has adopted the collectability rule, which controls the amount of damages recoverable when an insurer is found liable for bad faith failure to settle. *Frankenmuth Mut. Ins. Co. v. Keeley*, 433 Mich. 525; 447 N.W.2d 691, 707-08 (1989), on reh'g, 434 Mich. 1206 (1990), and on reh'g, 436 Mich. 372 (1990). Justice Levin's dissent, which was later adopted by the majority on rehearing, reasoned that the amount of damages an insurer will owe is limited to the value of the insured's assets not exempt from legal process.

Wausau's expert, Justin Cherfoli, determined that Reliable's assets not exempt from legal process as of the date of the judgment is $1,949,000. This is the number Wausau asks that the court find to represent the cap on damages as a matter of law.

Defendants argue that Justice Levin recognized that in determining the collectability of the insured, evidence of the relevant circumstances must be considered. In *Keeley*, Justice Levin instructed that on remand the trial court should determine the extent of Keeley's assets not exempt from legal process, including "his prospects of attaining in the future additional assets from which the judgment could be collected." *Id.* at 564-65. Levin described this as a compromise that "provide[s] protection for insurers

along the lines of the prepayment rule by precluding collection on the judgment from the insurer beyond what is or would actually be collectable from the insured." *Id.* at 565. This is an accurate statement of the measure of damages in bad faith cases where there is an excess judgment.

Defendants cite to the deposition of Kevin Lhotak of Reliable, where he stated that if Wausau prevailed in its declaratory action, "I would hope that showing good faith that I would be able to structure some type of payment program to the Plaintiff in that case, to exist and keep my business open." (Lhotak dep., p.78). He testified that with some adjustments, he believed Reliable could pay $500,000 per year toward the judgment until it was satisfied. *Id.*

Defendants' business valuation expert, Jay Cunningham, set forth his opinion that "based upon recognized valuation techniques, that the fair market value of a 100% equity interest in Reliable Transportation Specialists, Inc., on a controlling, non-marketable basis, was equal to $7,631,000 at September 30, 2017."

The law regarding the measure of damages is settled. There is an issue of fact as to what Reliable's collectible assets were on the date of the judgment. Now, therefore,

IT IS HEREBY ORDERED that plaintiff's motion for summary judgment is DENIED.

IT IS SO ORDERED.

Dated: October 17, 2018

                                        s/George Caram Steeh
                                        GEORGE CARAM STEEH
                                        UNITED STATES DISTRICT JUDGE

---

CERTIFICATE OF SERVICE

Copies of this Order were served upon attorneys of record on
October 17, 2018, by electronic and/or ordinary mail.

s/Marcia Beauchemin
Deputy Clerk